(No. 53280.-

RUTHIE BROOKS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (St. Francis Hospital, Appellee).

*Opinion filed March 18, 1981.*

Philip J. Schmidt, of Chicago, for appellant.

Gifford, Detuno & Gifford, Ltd., of Chicago (Thomas W. Gifford, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

This case involves a claim filed under the Workmen's Compensation Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.1 *et seq.*). The arbitrator found that petitioner, Ruthie Brooks, 57 years old at the time of the hearing, failed to prove that she sustained accidental injuries arising out of and in the course of her employment or that her present condition of ill-being was caused or aggravated by her employment. The Industrial Commission adopted the decision of the arbitrator. The circuit court of Cook County confirmed the decision of the Commission. Ruthie Brooks filed this appeal pursuant to our Rule 302(a) (73 Ill. 2d R. 302(a)), contending that the Commission's decision was against the manifest weight of the evidence.

At the hearing before the arbitrator, Ruthie Brooks, the claimant, Dr. George Farah, the claimant's current physician, and Kathleen Van Dermere, one of claimant's supervisors at the time of the alleged accident, testified.

Claimant testified that she was a housekeeper for St. Francis Hospital of 10 or 11 years' standing. Her job required her to clean patients' rooms, and it involved some lifting. On January 18, 1976, she entered the hospital linen closet near or soon after the end of her working day, in accordance with her duties, and, while pulling out a

linen cart, she tripped and fell. Her back "hit the linen cart, right straight *** on the corner [of the cart] — between the shoulders ***." No one saw her fall, claimant said, because her accident occurred between work shifts. She did not then notify anyone of her injury because she had already worked one-half hour of overtime.

For the next three days she did not work, using one of her days off and calling in sick. Her nephew drove her to work on January 22, and, after she informed her supervisor that she had fallen and was sick, she was examined by two doctors at St. Francis Hospital. One doctor, according to the claimant, recommended hospitalization. Dr. Thomas Campbell, however, who had treated her for a long time previously, advised against it and told her, after an examination, that there was nothing wrong with her.

Claimant was examined by Dr. Farah in early February. Soon thereafter, she was admitted to Henrotin Hospital under his supervision.

Prior to January 18, 1976, claimant said she did not have any pain in her back. For a year after the alleged incident she was unable to work or even "to fix a meal." At the time of the hearing, almost two years later, she was "still suffering from [her] back problems, not able to work, [or] lift anything." Prior to the hearing she was hospitalized under Dr. Farah's care at least two separate times after the initial hospitalization.

On cross-examination, claimant was asked whether she had had back trouble before and she denied having prior back trouble that prevented her from working. She had seen a doctor at St. Francis Hospital in 1968 about a backache, however, but explained that prescribed medication had cured the problem. It also was revealed, under questioning, that claimant had reported pain in her back and legs in 1972 and that, in 1973, she had been admitted into St. Francis Hospital because her knees and feet had "swollen up." She claimed that her back "wasn't hurting."

Respondent's attorney continued the questioning, however, and elicited the admission that Dr. Campbell had prescribed a back brace for her in 1973 which she wore while working. Claimant stated, however, that she had not had an accident involving her back in 1973.

Claimant also related that she had a conversation over the telephone with Mrs. Van Dermere of St. Francis Hospital and that she had obtained from her a leave of absence with pay for two weeks after the alleged accident. She had not visited Mrs. Van Dermere personally but had sent her daughter.

Dr. George Farah testified for the claimant, stating that he was very familiar with her case, having seen her approximately 30 times since he first examined her early in February 1976. He was able to testify without reference to his notes because of his familiarity with the case. He testified that claimant, during her first visit to him in February, told him that her injuries—low back pain and ambulatory difficulties—"happened after a fall sustained at work." She was hospitalized for these difficulties on February 14, 1976. Assuming the truth of claimant's story about the accident, he believed it was the cause of her back condition. In addition, it was his opinion that her immobilization resulting from the accident "might have been" the main cause of her thrombophlebitis, a condition for which she also apparently sought compensation. Thrombophlebitis is also caused by obesity.

On cross-examination, Dr. Farah admitted that claimant was hospitalized for obesity and hypertension, in addition to the asserted lumbosacral sprain. Other ailments, including hyperthyroidism, bleeding associated with a peptic ulcer, peptic esophagitis, carotid insufficiency, myocardial ischemia, hiatus hernia and a distended bladder with urinary tract involvement, were discovered during her hospitalization. Only the latter condition could be related to trauma, according to Dr. Farah.

Respondent's attorney also questioned the doctor about his failure to write down claimant's alleged fall in his notes and about the X rays taken of her back. Dr. Farah said that claimant told him of the fall but that he omitted to put it down, conceding he "should have mentioned it." Regarding the X rays, Dr. Farah related that they showed "some congenital defect, some narrowing of the L-5, S-1." The congenital defect was one in the "pars interarticularis." Such a defect could exist without compression of the L5 and S1. Claimant's noncongenital condition, which he called spondylolisthesis, was usually "caused by some type of trauma." (But see 1C R. Gray, Attorney's Textbook of Medicine pars. 1772(3) through 1772(3)(*l*) (1980).) He was then asked whether he would change his opinion regarding the cause of claimant's injury if he were informed that claimant had previously received treatment for her back. His conclusion under those facts was that her condition was "aggravated by the accident." (Claimant had informed Dr. Farah, however, in response to his question, that she had not received treatment from any other doctor.) The doctor concluded that claimant could not work because of a lumbosacral sprain.

Respondent called Kathleen Van Dermere to testify. She was employed at St. Francis, where her duties included supervising, in some capacity, health care for sick employees and the administration of employee leaves of absences. She, too, was very familiar with claimant, but testified with the aid of her records. On February 6, 1976, she signed a leave of absence for the claimant. Claimant had requested it because "she felt so bad" that she was "unable to work at [that] time." When asked what her problem was, claimant replied, "I don't know. I am tired, can't work anymore." Mrs. Van Dermere was never informed of the alleged accident at work. On cross-examination she said claimant was a "good worker, very slow, difficult to get around, shuffled slowly."

Both sides have introduced various hospital records, consisting of more than 500 pages on this record, into evidence. Many of them are indecipherable. Others are only indirectly relevant to this case, for claimant admits that her hospital treatment for syncope, hypertension, gastric ulcer, esophagitis, myocardial ischemia, hiatus hernia, sickle-cell anemia, and marked obesity were not conditions compensable under the Act.

The records show that in July 1973 X rays of claimant's lumbosacral spine taken at St. Francis Hospital were the basis of an impression that claimant had "bilateral osteitis condensans ilii." In August of that year, additional X rays taken at St. Francis Hospital revealed "what appears to be a defect in the pars articularis of the vertebral segment of L5." Furthermore, "[o]blique views of the lumbosacral spine reveal definite evidence of spondylolysis on L5." The records also confirmed that claimant had complained of and was treated for back pain prior to the accident alleged here.

More X rays were taken at St. Francis Hospital on January 23, 1976, five days after the alleged accident. They revealed "a questionable very minimal forward slipping of L5 on S1," and the impression, as relevant here, was that claimant had "bilateral osteitis condensans ilii" and a "questionable 1st degree spondylolisthesis of L5 on S1." Thus, it can be seen that, according to the X rays taken at St. Francis Hospital, claimant's condition, as revealed on the X rays, changed only infinitesimally, if at all, after the alleged accident. See 1C R. Gray, Attorney's Textbook of Medicine pars. 1772(3) through 1772(3)(*l*) (1980).

More important are the records relating to claimant's version of the accident. One record of January 27, 1976, somewhat corroborative of claimant's testimony, noted that claimant's pain was severe for three days. In the records relating to claimant's February-March hospitaliza-

tion, however, assertedly the result of the work accident, it was noted once that claimant stated she fell on ice on the street once three years previously, injuring her back and neck. In another record relating to that same hospitalization, claimant stated that her pain began two years previously after a fall. Again, in her July 1976 hospitalization, it was noted in a record that claimant said she had fallen two years before and had been having back pain ever since. It was not until her November 1976 hospitalization, nine months after the alleged accident, that it was first noted that claimant said she fell at work, or had a bad fall in January.

"It is the province of the Industrial Commission *** to draw reasonable inferences and conclusions from competent evidence in the record. On review, the function of this court is limited to a determination of whether findings of the Commission are against the manifest weight of the evidence ***." (*Pazara v. Industrial Com.* (1980), 81 Ill. 2d 76, 83-84.) The Commission in this case could reasonably have concluded that claimant's testimony regarding her alleged accident was less than candid, in view of Mrs. Van Dermere's testimony and the hospital records previously discussed. In addition, the Commission could reasonably have concluded that claimant's current condition of ill-being was a result of non-work-related problems and that, from the X rays taken at St. Francis Hospital, the spondylolisthesis existing prior to the alleged accident was not aggravated by claimant's employment. We do not say these conclusions are compelled from the record or even that this court would have drawn the same inferences were we presented with the same testimony in the first instance. The Commission has drawn reasonable inferences from this record, however, and its decision will not be disturbed.

The judgment of the circuit court to this effect is affirmed.

*Judgment affirmed.*